IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,    )<br>                              )<br>    Plaintiff,              )<br>                              )<br>vs.                           )<br>                              )<br>JONATHAN MICHAEL THOMAS,      )<br>                              )<br>    Defendant.                )<br>_____) | No. CR 10-628-TUC-CKJ (GEE)<br><br>**ORDER** |

On February 22, 2011, Magistrate Judge Glenda E. Edmonds issued a Report and Recommendation (Doc. 44) in which she recommended that the Motion to Suppress Evidence (Doc. 14) filed by Defendant Jonathan Michael Thomas ("Thomas") be denied. The Report and Recommendation notified the parties that they had fourteen days from the date of being served with the copy of the Report and Recommendation to file any objections. Thomas has filed an objection.  A response has been filed.

*Testimony Regarding Alert and Indication*

Border Patrol Agent Paul DuBois ("DuBois"), Special Operations Supervisor and K9 Coordinator for the Tucson Sector, testified that, within the Border Patrol, an "alert" is "a change of body posture and increased respiration, when the K9 first detects odors he's been

trained to detect." RT, p. 84.[1] DuBois also testified that an "indication" is "a trained behavior that pinpoints source." *Id*. at 84-85. DuBois further explained the difference:

> Q(AUSA): . . . So is – and looking at alert behaviors versus an indication, which is the focus for the K9 handler?
> A(DuBois): I think the critical element is that the K9 handler be able to read the K9's alert.
>
> Q: And so then the indication is significant how?
>
> A: The – the indication is significant and it is a trained behavior once the dog alerts, the importance is that the handler does read that alert, the dog will then follow that odor to source and when he gets to source, he provides that pinpointing behavior, which would be –
>
> Q: Because there can be –
>
> A: – the indication. But there may be reasons the dog does not indicate.
>
> Q: Like you had said previously, environmental factors?
>
> A: Could be, certainly.
>
> Q: And perhaps if there was – I guess for the sake of argument, a vehicle that someone had recently smoked a – a marijuana cigarette, would there be an odor of that marijuana in the vehicle?
>
> A: There very well could be, yes.
>
> Q: But no physical marijuana as it had been smoked?
>
> A: Correct.
>
> Q: So in that situation, could a dog alert to an odor?
>
> A: Yes.
>
> Q: But there not be anything to indicate to?
>
> A: Correct.
>
> Q: And you said the focus, though, is the alert?
>
> A: The focus is the alert.

RT, pp. 119-120. Dubois also stated that a handler had to be trained to recognize an alert and that the alert, as opposed to the indication, was the most important part. *Id*. at p. 85.

---

[1] Motion to Suppress Hearing and testimony before Magistrate Judge Glenda E. Edmonds on August 25, 2010. Recorded Transcript ("RT") [Doc. 30].

- 2 -

In his objection, Thomas asserts that insufficient evidence was presented to refer the vehicle to secondary inspection. Border Patrol Agent Christopher LeBlanc ("LeBlanc") testified:

> A(LeBlanc): As the vehicle approached, my K9 started to demonstrate alert behavior and at that point I had the primary inspection agent refer the suspect vehicle into secondary inspection.
>
> * * * * *
>
> A: As the suspect vehicle approached my position where I was standing at, Beny-A, my K9, started to demonstrate alert behavior by his ears perked up, his breathing pattern started to change, his body posture started to change, becoming very animated about his searching, trying to pinpoint – the K9s are trained to pinpoint the source of the odor. So his tail goes up and he's along – just on the bottom of the toolbox towards the gas tank, and as he's air-scenting he starts to move towards the toolbox. So at that point I could tell he's in alert behavior and at that point I referred the suspect vehicle into secondary inspection.
>
> Q(AUSA): Okay. So just to clarify, those type of mannerisms I guess –
>
> A: Uh-huh (affirmative).
>
> Q: – for lack of a better word that –
>
> A: Uh-huh (affirmative).
>
> Q: – the dog was indicating –
>
> A: Right.
>
> Q: – or the dog was exhibiting.
>
> A: Right.
>
> Q: You said breathing was different?
>
> A: Right.
>
> Q: And his tail was wagging?
>
> A: Right. So what I – what I'm looking for in my K9, what I'm looking for is a change in breathing patterns and body posture. Normally, if a vehicle would come by and there's no odor present, he stands there and he just air-scents, and he just – he just kind of smells the car as it goes by.
>
> Q: Just sitting there passively?
>
> A: Just – just – he'll just stand there passively not – not move, just stand at my side and just sniff the air as it goes by.
>
> Q: But that's not what happened here?

1   A:              That's not what happened here, correct.

2   RT, pp 18-21.  LeBlanc further testified:

3      Q(DefAtty):  Did you walk, move your position, relative to the – the vehicle?

4      A(LeBlanc):  Yeah. I think prob – and I – I'm trying to think to this specific case. Generally speaking, the dog when he becomes – he gets into alert behavior he'll become a lot more adamant and wanting to move around, trying to pinpoint the source of the odor. So I would move several steps to get out of his way, allow him to do his thing.

7      Q:           You don't recall specifically though?

8      A:           Not in this specific case, no.

9      Q:           And you don't put in your report anything about what specifically you saw, whether it was breathing, body posture, tail wagging –

11     A:           Right.

       Q:           – one of those or all of those, correct?

12     A:           Correct.

13     Q:           So it could have been one, it could have been all?

14     A:           It's most likely all of them.  When speaking of my dog, it's most likely all.

16     Q:           But it could have been one, could have been all?

17     A:           Correct.

18  RT, pp. 38-39.

19        Additionally, Thomas disputes the magistrate judge's conclusion that the canine

20  indicated prior to the search of the toolbox. Thomas points out that LeBlanc initially testified

21  that Beny-A "indicated" prior to the search of the toolbox, but subsequently testified that the

22  "indication" occurred after the toolbox had been searched. LeBlanc testified:

23     A(LeBlanc):  As soon as he got to the toolbox and I presented the toolbox, he immediately went into what we call a – an indication or a sit. It's a passive indication. The dogs are trained to passively indicate. So once they smell the odor, they'll go into a sit.

25     Q(AUSA):  And so after that happened, what did you do?

       A:           At that point, Beny-A was put back into his kennel so I could look inside the toolbox.

28  RT, p. 24.  LeBlanc subsequently testified:

- 4 -

1  Q(AUSA):  Did – and you say that your – that the K9 indicated at some point?

2  A(LeBlanc):  At one point, yes.

3  Q:  And indicated you say by sitting down?

4  A:  Correct.

5  * * * * *

6  Q:  You didn't put in your report that your K9 sat down?

7  A:  It's not relevant as far as I'm concerned.

8  Q:  You didn't put in your report that your K9 made an indication as compared to an alert?

9  A:  Correct.

10 * * * * *

11 Q:  And you say that before – or just after you – well, after you cast your hand by the toolbox, the – the dog jumped up?

13 A:  On which occasion?

14 Q:  In – in secondary.

15 A:  Yes.

16 Q:  And – and that's where you say it sat down?

17 A:  Not on that occasion, no.  The dog was deployed three times.

18 Q:  What was the third time?

19 A:  The third time was to – once the ready alert behavior in secondary, the K9 is put back into his kennel, I come back and inspect – get consent to inspect the contents of the toolbox.  Once I confirm the contraband in the – the toolbox and contraband is actually found and once everybody has been secured, I'll re-deploy the K9 again, present the toolbox, and he'll provide me with a sit, and his reward comes out.  So essentially we have to confirm that contraband has lo – been located before he gets his reward.

23 Q:  And did he sit down at that point?

24 A:  Yes, he did.

25 Q:  Did he sit down at any point before that?

26 A:  No, not to the best of my recollection, no.

27 RT, pp. 45-46.  LeBlanc also testified:

28

- 5 -

| | | |
|---|---|---|
|1| Q(Court): | Well then you bring him around, now he's at the gas tank side and then what does he do at that point? |
|2| A(LeBlanc): | At that point – |
|3| Q: | There's more alert before not – |
|4| A: | Correct. |
|5| Q: | – not indicated? |
|6| A: | Correct |
|7| Q: | Okay. So what did he do then? |
|8| A: | At that point he – he – he's still – he's up high, he's got his nose – he's dee – he's breathing deeply through his nose, his mouth is shut, and all the air is coming into his nose, his nose is on the toolbox. |
|9| Q: | Nose is on – |
|10| A: | And – |
|11| Q: | Is he – is he up there on two feet? |
|12| A: | He's up there on two feet and as I'm – |
|13| Q: | Okay. |
|14| A: | – and as I'm doing this, I'm continuing on presenting. |
|15| Q: | Okay. |
|16| A: | If he's sticking to it, that's telling me. |
|17| Q: | I see. Okay. |
|18| A: | So I'm trying to get him to move – |
|19| Q: | All right. |
|20| A: | – from that location, but he's not going to move there, because he knows he's got an odor he's been trained to detect at that location. |

RT, pp. 47-48.  LeBlanc also testified:

Q(DefAtty): So the – the indication comes when at that point you've already opened up the toolbox and believe you found contraband?

A(LeBlanc): Correct.

Q: And you wanted to – you wanted to for your reinforce for your K9 that it had found what it should have found, right?

A: Correct.

- 6 -

1   Q:    And it was at that point that it sat down, indicating the – or giving an indication?

2   A:    Yes. But I think you need to understand that – that just because a dog's in odor – we refer to it as being in odor or smelling the odor it's trained to detect, it doesn't mean he's going to automatically sit just like that. He's going to try to pinpoint the source where you – of the order where he's getting the most amount of odor. So I'm trained to read that and understand that and see that. So what I do is I'll praise him off; good boy, good boy, good boy, let's go – and I'll put him away and confirm the actual contraband is in the vehicle.

    Q:    But your K9 is trained to –

    A:    Right.

    Q:    – indicate before you actually go and do the search, right?

    A:    I don't follow you, sir.

    Q:    In other words, you're not – you're not suppos – the dog is not – you don't train the dog to sit down to detect these trained odors so it can sit down after the fact after you've already -- after you already know what it is, right?  After you've already conducted the search?

    A:    Right, he's trained to pinpoint the source of the odor, then go into a sit. Now keep in mind there's a lot of variables that come into play with this as well; time of day. With my particular dog, if it's very hot outside, sometimes he'll just stop and look at me. I read the alert behavior and I see the alert behavior, but it's hot, he's been out there a while and the pavement's too hot for him to sit down. He won't sit. He'll just stop and look at me; where's my toy, that express – that's the expre – that's how I interpret reading his – his expression. So there's – there are some variables there, yes.

    Q:    But – but at – and the K9, it goes through a whole program on his training, correct?

    A:    Correct.

    Q:    And they – they don't train the dog to give indication behavior by looking at the handler, right?

    A:    Correct.

RT, pp. 49-51. LeBlanc also testified:

    Q(Court):    . . . Now, you said your – he got over here to the – where the gas tank is –

    A(LeBlanc):  Correct.

    Q:    – and that's when he put his paws up and then you said he wouldn't move from that even though you went casting further –

    A:    Yes, ma'am.

- 7 -

| | | |
|---|---|---|
| 1 | Q: | – he would not move? |
| 2 | A: | Correct. |
| 3 | Q: | And Is that a – an alert for you?  I mean, because – |
| 4 | A: | That's an indication for me, yes, ma'am. |
| 5 | Q: | Okay. |
| 6 | A: | That he – |
| 7 | Q: | So what's – again, the difference between an alert and an indication; an indication is he's found it or he's – |
| 8 | | |
| 9 | A: | He's found it – |
| 10 | Q: | – pretty sure? |
| 11 | A: | – an indication and he's going to sit down. |
| 12 | Q: | Okay.  But he didn't sit down this time because you – what, you pulled him away? |
| 13 | A: | Actually, yes, I would put – actually put him away at this point. |
| 14 | Q: | Okay. |
| 15 | A: | So I – so I could confirm there was actually an odor there. |
| 16 | Q: | Because he wouldn't follow your hand? |
| 17 | A: | Right. |
| 18 | Q: | Because he wouldn't follow your hand. |
| 19 | A: | Exactly. |
| 20 | Q: | And he stood there. |
| 21 | A: | He stopped. |
| 22 | * * * * * | |
| 23 | Q(DefAtty): | And you didn't wait for him to sit down? |
| 24 | A: | No, I did not. |

25  RT, pp. 54-55.

26  . . .

27  . . .

28  . . .

- 8 -

*Canine Certification Records*

The government must disclose "'the dog's training and certification records under Fed.R.Crim.P. 16[.]'" *United States v. Nava*, 363 F.3d 942, 944 n. 1 (9th Cir. 2004), *citing United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003). In this case, these records were disclosed by the government. These records, along with the testimony presented at the hearing, establish that the canine team of LeBlanc and Beny-A were reliable at the time of the search of the vehicle in this case. Although Thomas asserts that the redacted records do not establish the reliability of the canine team, the records established not only the training and certification, but also the passing scores. *See* Exhibit 2. Thomas has not provided any authority for his apparent assertion that additional records are needed to establish that Beny-A is a well-trained and reliable dog. The Court agrees with the magistrate judge that unredacted records need not be disclosed to the defense. The Court further agrees with the magistrate judge that the redacted records establish the reliability of the canine team.

*Referral to Secondary Inspection*

"[B]rief detention following valid immigration questioning is permitted so long as the government can prove "an articulable suspicion or a minimal showing of suspicion." *United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991). The Ninth Circuit has found that an "'alert' by [a] certified, reliable narcotics detector dog [is] sufficient, even by itself, to support a finding of probable cause." *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003). Thomas asserts that insufficient evidence was presented to permit the referral to the secondary inspection site – Thomas points out that LeBlanc's testimony makes clear that he had no memory or record of what Beny-A actually did as an alert in primary inspection.

However, during his testimony LeBlanc described the conduct that Beny-A exhibited when alerting. He further testified that Beny-A could have exhibited one or all of those behaviors in alerting in this case. DuBois testified regarding the importance of the handler

1 reading the alert behavior of a canine. In this case, LeBlanc testified that he had been a
2 certified handler since 2008 and that Beny-A was the first dog he has worked with. As
3 pointed out by Thomas, the behaviors exhibited by Beny-A to demonstrate an alert are
4 untrained behaviors that may also appear in the absence of the detection of drugs. It is not
5 the individual behaviors that constitute an alert, but the training and experience of LeBlanc
6 and Beny-A working together that permits LeBlanc to "read" Beny-A and determine when
7 Beny-A has alerted. *See generally Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 61
8 L.Ed.2d 357 (1979) (observing that a trained investigator may be "able to perceive and
9 articulate meaning in given conduct which would be wholly innocent to the untrained
10 observer"). In this case, LeBlanc's testimony makes clear that, through the certification
11 process, the re-certification processes, and LeBlanc's history and experience of working with
12 Beny-A, LeBlanc read Beny-A and recognized alert behavior. The Court finds the evidence
13 established that Beny-A alerted during primary inspection.

15 *Probable Cause to Search the Toolbox*

16 Initially, LeBlanc testified that Beny-A either indicated or sat. Upon further
17 questioning, LeBlanc clarified that he can read Beny-A and recognize when he has indicated
18 without Beny-A sitting down. Although Beny-A is trained to sit as an indication, LeBlanc
19 testified that he prevented Beny-A from sitting. This is consistent with DuBois' testimony
20 that the most important thing is the alert and that the handler be able to read the canine.
21 Contrary to Thomas' assertion, LeBlanc did not "change his story," but simply provided
22 further details and explanations. The Court agrees with the magistrate judge's conclusion that
23 Beny-A "indicated" at the toolbox.
24 As pointed out by the magistrate judge, the Ninth Circuit has found that an "'alert' by
25 [a] certified, reliable narcotics detector dog [is] sufficient, even by itself, to support a finding
26 of probable cause." *Cedano-Arellano*, 332 F.3d at 573. In this case, there was not only an
27 alert, but also an indication. Moreover, even if Beny-A's failure to sit would result in a
28 conclusion that Beny-A did not "indicate" at the toolbox, there is no basis to conclude that

either (1) Beny-A's original alert or (2) Beny-A's alert behavior in secondary inspection, *see* RT, p. 47, does not provide sufficient probable cause to search the toolbox. *See e.g. United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (declines to adopt a stricter standard that requires a final indication, rather than an alert, to establish probable cause).

*Consent to Search*

The Court agrees with the magistrate judge that, because probable cause existed for the search, the Court does not have to reach the issue of whether Thomas consented to the search. *See United States v. Ross*, 456 U.S. 798, 799, 825 (1982); *see also Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009) (noting there are other exceptions to the warrant requirement for vehicle searches, besides the search-incident exception, including probable cause to believe a vehicle contains criminal activity evidence); *California v. Carney*, 471 U.S. 386, 394-95 (1985).

Accordingly, after an independent review, IT IS ORDERED:

1. The Report and Recommendation [Doc. # 44] is ADOPTED;
2. The Motion to Suppress Evidence (Doc. 14) is DENIED.

DATED this 27th day of April, 2011.

_____
Cindy K. Jorgenson
United States District Judge